STATE OF IOWA, Appellee, v. HARRY CHANEN, Appellant.

No. 39974.

FEBRUARY 11, 1930.

*Hirsch & Riepe,* for appellant.

*John Fletcher,* Attorney-general, *H. M. Ofelt,* County Attorney, and *John Hale,* Assistant County Attorney, for appellee.

DE GRAFF, J.—The defendant was charged and convicted of receiving stolen property. Section 13042, Code, 1927, defines the crime charged in these words, so far as material to the instant case:

"If any person buy, receive, or aid in concealing any stolen * * * goods, or property the stealing of which is larceny, * * * knowing the same to have been so obtained, he shall, when the value of the property so bought, received, or concealed by him exceeds the sum of $20, be imprisoned * * *; and when the value of the property * * * does not exceed the sum of $20, be fined * * * or imprisoned in the county jail * * *."

Every crime recognized in our Code and in every penal code has certain essential ingredients, and each of these ingredients must be established by the evidence beyond a reasonable doubt. A verdict cannot rest on mere suspicion. Clark and Marshall's "Law of Crimes" (3d Ed., 1927), Section 380, concisely states the essential elements of the crime of receiving stolen property, to wit:

"To constitute this offense—1. The property must be received. 2. It must at the time be stolen property. 3. The receiver must know that it is stolen property. 4. His intent in receiving it must be fraudulent."

See, also, May's Criminal Law (3d Ed.), Section 324. The doctrine above quoted is the universal doctrine, as stated in all standard texts, and also as interpreted by courts of last resort where a statute of similar character to the Iowa statute is involved. For example, the Virginia statute (Code, 1887, Section 3714) has the same intent, content, and language as the Iowa statute, and the Supreme Court of Virginia, in *Hey v. Commonwealth,* 32 Grat. (Va.) 946, speaking through Justice Burks, said:

"To convict an offender against this statute, four things must be proved: 1. That the goods * * * were previously

stolen by some other person. 2. That the accused bought or received them from another person, or aided in concealing them. 3. That at the time he so bought or received them * * * he knew they had been stolen. 4. That he so bought or received them * * * *malo animo*, or with a dishonest intent.''

In the instant case we are not concerned with Tests (1), (2), and (4). It is established, under the record before us, that the property in question was received into the possession of the defendant, and that the metal was, at the time when received, stolen property; and, were it established that the defendant purchased the goods, knowing the same to have been obtained by theft, it could be said that the criminal or fraudulent intent was circumstantially shown. The sufficiency of the evidence as challenged by the appellant, therefore, necessarily gravitates around Test (3): that is, did the defendant know that the property in question, at the time when received by him, was stolen property? This proposition is the primary question upon which the defendant's motion for a directed verdict was based. It is the real question in this case.

Upon the conclusion of all the evidence, the defendant moved for a directed verdict in his favor. This motion was overruled. The primary ground of the motion challenged the sufficiency of the evidence to justify a verdict of guilty. As said in *State v. Derry*, 202 Iowa 352:

''This court will not substitute its conclusions upon the facts for those of a jury that has returned a verdict of guilty, unless it appears from the whole record that there is such a want of support for the finding as will require a reversal.''

This language constitutes a reaffirmation of the principle recognized in *State v. Hessenius*, 165 Iowa 415.

We now turn to the facts. The Chanens (father and two sons, one of whom is the defendant Harry Chanen) were engaged under the trade name ''Chanens'' in business at 619-623 Market Street, Burlington, Iowa, and also in other cities in this state. Said business was both retail and wholesale, and had to do with the buying and selling of iron, rags, metal, and auto parts. On January 7, 1929, one C. Wheatley brought to the Burlington office in two metal containers some broken and burned metal (in small pieces), weighing about 150 pounds,

which metal was purchased for $10 by the defendant, who happened to be the only Chanen in the office at that time. In payment thereof, Wheatley was given a check on the Burlington Savings Bank for $10, which represented the purchase price. This check was signed ''Chanen's, Harry Chanen.'' It is disclosed that Wheatley, the vendor, acting jointly with one Earl Reinert, committed the despicable and dastardly act of removing 70 or 80 memorial markers from the graves of the soldier dead in Crapo Park, of Burlington. This theft occurred between 3 and 4 o'clock A. M. on the morning of January 7, 1929; and immediately after the theft, the markers were taken to the Reinert home, where they were broken to pieces and burned, so as to destroy their identification. No one except the two thieves knew, at the time that Harry Chanen purchased this junk, that the memorial markers had been stolen from Crapo Park. At this point it may be recited that, upon the information later furnished by the defendant to the police, Wheatley was arrested, tried, and convicted, and is now incarcerated in the state penitentiary at Fort Madison, Iowa. The record fails to disclose whether or not the accomplice, Reinert, was apprehended. Wheatley was used as a witness for the State upon the Chanen trial. Upon his direct examination, as a self-admitted thief, he testified, *inter alia*:

''I didn't see anybody but Harry. We had a little argument on the kind of brass,—what kind of stuff it was. He said it was one kind of brass, and I said it was another. He looked at them, and asked me where I got them. I told him I wouldn't tell him where I got them. We took them in on the scales and weighed them, still arguing about what kind of stuff they were. He looked them over again on the scales and weighed them, and I dumped them in a can. * * * He picked up several of the pieces. I could not estimate how many. He asked me where I got them. I told him that it didn't concern him, * * *''

On the cross-examination, Wheatley testified:

''I had sold to Harry Chanen previously, and to other dealers in junk. On the morning of the theft, I went with Reinert and brought the markers back to the house and broke them, to destroy the identification. That was my purpose in breaking them,—to keep them from being recognized. They

changed considerably in color, and of course in shape of pieces and in size, and that was my purpose. It took about an hour. I heated them and broke them up with hammers and things. Reinert and I both worked at it. I drove down to Chanen's place of business where I had always driven before, in front of the business, on Market Street. It was broad daylight on the open street. * * * I told him I wanted 8 cents for it, and he would only give me 7 cents. I told him I had been offered 8 cents. I probably told him that because he always argued about prices. I tried to get as much as I could, and he tried to pay as little as he could. I had been dealing in brass of various kinds, and had sold him brass previously. 8 cents was about what I was getting in Burlington at that time. I told him I was going to get 8 cents some place else. I don't remember whether he told me to sell it some place else. He may have done it. I wouldn't say that he didn't. * * * I was claiming it was red brass, and he was claiming it was yellow brass. Q. You wouldn't say that you didn't tell him that you got it in Keokuk? A. I might have done it. I don't know. I wouldn't say that I didn't tell it, that I got it in Keokuk from a man by the name of Bryant, but I don't remember if I did. I don't remember that I told him that I had gotten it in Keokuk. No, sir, wouldn't say that I didn't tell him that, either. * * * At the time [of sale], nobody knew that the markers had been taken. It was four days, I think, before there was any publicity about the markers' being taken,—the first that anybody knew, besides myself and Reinert, that they were taken.''

With Wheatley's testimony in mind, what does the defendant have to say in these particulars? Speaking of Wheatley's visit with the brass to the Chanen place of business, Harry Chanen testified:

''Wheatley came to the office. He asked me if I paid 8 cents for red brass. I said, 'Yes.' I went outside on the street. The truck [Wheatley's] was parked in the street on Market Street. I went to the truck and took a piece of metal and looked at it, to see if it was red or yellow brass. The metal was in the truck, I think in two containers. The way it seemed to me, it was yellow brass, and was worth 7 cents a pound. Wheatley said he knew a place where he could get 8 cents; so I said, 'If

you can get it, it is all right with me.' So he thought it over, and said, 'I believe I will sell it to you.' We weighed it up. He wanted the container, so we put it in sacks. The scale is on the corner of Market and Seventh, and the office is a little west, and in the next building west,—the next door. We figured it up, and it was about $10, and I gave him a check for $10. It was about 9 or 10 o'clock, I would think. The check is dated January 7th, and that is the date I gave him the check. I didn't have anything more to do with the metal that day, after I bought it from Wheatley. The metal accumulates until we get a truckload, and the men around the shop load it up and take it down to the warehouse, where the big quantities of metal mostly are kept. In the course of our business, it is the usual thing to buy metal of that character,—different kinds of stuff. There was nothing different in the matter of the purchase of this metal that morning than usual. When I went to the truck, I asked him where he had got it. He said he got it in Keokuk. He said he got it from a man named Bryant.''

It is sufficient to say that, upon a careful reading of the entire testimony of Wheatley and of the defendant, there is no conflict; and we are satisfied that the evidence of Wheatley, the thief, considered with the other facts and circumstances, does not present substantial proof of the crime charged, in the essential particular, that Harry Chanen, at the time he made this purchase, knew that the metal was stolen property. This is not a case where guilty knowledge may be imputed to the defendant. See *State v. Van Treese*, 198 Iowa 984.

It is said in *State v. Caveness*, 78 N. C. 484:

''To be guilty, he must have known, at the moment of receiving it, that it had been stolen, and he must at that time have also received it with a felonious intent.''

In the case at bar, *scienter* has not been established, circumstantially or otherwise. It is quite obvious that the accused was not knowingly aiding the thief, Wheatley. He purchased the metal in the ordinary and usual course of business. This is not a case where the accused purchased with the idea of obtaining a reward for restoring the property to the owner, and it is just as clear that he did not have an intent to derive an unreasonable profit from the act. As pointed out, the vendor and pur-

chaser quibbled and argued for some time as to the kind of brass Wheatley offered for sale. It is also shown that they quibbled over the price, which involved a difference of 1 cent per pound. The argument over these matters was a good-faith argument, and there are no facts in the record upon which a different conclusion can be based. The only possible ground of suspicion, if it arises to the dignity of a suspicion, is the statement credited to Wheatley when he told the defendant Chanen that "where he got the metal was no concern of his." In this connection it must be remembered that Wheatley also testified that he may have told Chanen, in answer to the latter's inquiry, that he got the metal in Keokuk, and from a person named Bryant. He (Wheatley) did not "just remember" whether he told Chanen that fact or not. He would not and did not deny the testimony of the defendant. It is sufficient to say that there is nothing about the method of the sale and the conversation which occurred immediately prior thereto, when considered in the full light of all the evidence, that would sustain a finding beyond a reasonable doubt that the defendant knew the brass had been stolen, at the time he purchased same.

It may also be pointed out that the defendant's conduct after the purchase fails to sustain, but in fact negatives, his guilt. After the theft of the markers had been discovered, the superintendent of Crapo Park reported the fact to the police, and on the next day (January 11, 1929), Captain Machholz, of the Burlington police, went to all the junk yards in the city, with a sample marker, and requested the respective managers in charge of such yards to notify him immediately, in the event that any such markers were offered for sale. When this request was made, neither Captain Machholz nor any person (except the thieves) knew that these markers had been broken into bits and burned, to conceal their identity. On January 14th, the elder Chanen, in preparing a carload shipment of old metal, found in his metal yard certain broken brass. This was in a place unconcealed, and where it had been placed in the usual course of business. On the same evening, at the Chanen home, he reported this fact, and it was then and there agreed that he, with his two sons, would investigate, the next morning. They did investigate, and thereupon Sam Chanen, the older brother, was delegated to report the matter to Captain Machholz. Sam

immediately went to the police station, but was unable to locate the captain, but made inquiry from another officer where he might find the captain. This officer reported to Captain Machholz that Sam was looking for him, and immediately, without waiting for Sam, the captain went to the Chanen yards. The defendant, Harry Chanen, was there at that time, and truly divulged every fact connected with the deal, and even went to the bank to get the check which he had given to Wheatley. It was this information that led to the arrest and conviction of Wheatley. It is clear that Chanen co-operated with the police in every way possible. There was no attempt at concealment at any time.

In the light of the entire record, the defendant's motion for a directed verdict should have been sustained.

The judgment entered is—*Reversed.*

EVANS, FAVILLE, ALBERT, and KINDIG, JJ., concur.